## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SHARLA S. RUSSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-560-TLW |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Sharla S. Russell seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her deceased husband's claim for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 14). Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. § 404.1512(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

of that impairment during the time of his alleged disability. 20 C.F.R. § 404.1512(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. § 404.1508. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. § 404.1513(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the

evidence nor substitute its judgment for that of the Commissioner. See <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff's husband, then a forty-five year old male, applied for benefits under Titles II and XVI on July 23, 2010, alleging a disability onset date of September 30, 2005. (R. 118-21). Plaintiff's husband's last insured date under Title II was December 31, 2014. (R. 14). Plaintiff's husband alleged that he was unable to work due to multiple ailments, including "extreme Peyronie's disease, diabetes, high blood pressure, stroke and sleep apnea." (R. 198). Plaintiff's husband's claims for benefits were denied initially on December 1, 2010, and on reconsideration on January 11, 2011. (R. 84-92, 97-102). Plaintiff's husband then requested a hearing before an administrative law judge ("ALJ"). (R. 103). The ALJ held a hearing on November 22, 2011. (R. 31-79). The ALJ issued a decision on February 16, 2012, denying benefits and finding plaintiff's husband not disabled. (R. 8-30). The Appeals Council declined plaintiff's husband's request to review the case; therefore, the ALJ's decision serves as the final decision of the Commissioner. (R. 1-4). Plaintiff timely appealed the Commissioner's decision.[2] (Dkt. # 2).

<u>The ALJ's Decision</u>

The ALJ found that plaintiff's husband was insured through December 31, 2014, and had performed no substantial gainful activity since May 5, 2010, his alleged onset date. (R. 14). The ALJ found that plaintiff's husband had the severe impairments of "obesity, diabetes, hypertension, Peyronie's disease, anxiety and depression." <u>Id.</u>

---

[2] Plaintiff's husband died February 21, 2012. (Dkt. # 27). Plaintiff filed a "Notice Regarding Substitution of Party Upon Death of Claimant" form at the administrative level, substituting herself as a party on August 9, 2012. (R. 115).

After considering plaintiff's husband's impairments, the ALJ determined that plaintiff's husband did not meet or medically equal a listing. (R. 15). In reviewing plaintiff's husband's severe depressive disorders under the "paragraph B" criteria, the ALJ found that plaintiff's husband had mild restrictions in his activities of daily living; mild difficulties with social functioning; moderate difficulties with concentration, persistence, and pace; and no episodes of decompensation of extended duration. Id. Plaintiff's husband also did not meet the "paragraph C" criteria. (R. 16). The ALJ then reviewed plaintiff's husband's testimony, the medical evidence, and other evidence to determine plaintiff's husband's residual functional capacity ("RFC"). (R. 16-23).

Summarizing plaintiff's husband's testimony, the ALJ noted that he was 5'10" tall and 324 pounds with an 11th grade education. He did not obtain a GED. He drove locally once a week, but said that his wife normally drove. He lived with his wife and 88 year old stepfather in a single level home. He described his prior work as a fast food cook, a manager in training in the restaurant field, and customer service work. Plaintiff's husband stated that in May 2010, he was laid off from his position at a donut shop because his Peyronie's disease worsened, and his medications increased, especially pain medications. (R. 17). He admitted to smoking marijuana "maybe a couple of times per month." Id. Plaintiff was the sole source of support for her husband. He went to bed at 10:00 p.m., rose briefly when plaintiff left for work, then went back to bed until noon. Plaintiff's husband's step father helped out around the house, plaintiff's husband did not cook much, and he watched a lot of television. The family attended church weekly unless plaintiff's husband was not feeling well, and plaintiff's husband went out frequently during the month to attend various doctors' appointments. Id. He said that he and plaintiff had to kick their son out for bringing drugs into the house and that he had suicidal thoughts and behavior due to issues with his health and problems with his son.

Plaintiff's husband claimed that constant pain and medication side effects prevented him from working. He said he could walk two blocks, stand for 30 minutes, and sit 10 to 15 minutes before he needed to move around. (R. 17). He said he took unscheduled breaks while working, had more bad days than good, and had to "move around to get comfortable." (R. 17-18). His pain at the hearing was seven of ten, and he said the pain ranged from six of ten to ten of ten. (R. 18). He received a diagnosis of major depression with psychotic features, claimed he heard voices directing him to kill himself, and claimed he sometimes heard his father's voice. Plaintiff's husband said that he once tried "an alternative medicine plan," and stopped his pain medications. This plan worked for a short time, but he eventually resumed his traditional medication. Id.

Joel Adkisson, D.O., plaintiff's husband's treating physician, referred plaintiff's husband to Charles Hill, M.D., a psychiatrist, to evaluate possible panic attacks. Id. Plaintiff's husband presented to Dr. Hill on January 13, 2010, and received the diagnosis of "suspect anxiety disorder, likely panic disorder with depression." Id. During a subsequent visit on May 2, 2011, Dr. Hill adjusted plaintiff's husband's medications.

During an emergency room visit on May 5, 2010, plaintiff's husband received a CT scan. He was diagnosed with "penile calcification symptomatic; vaccine for streptococcus pneumonia, hypertension, obesity, [and] Type II diabetes mellitus." Id. Dr. Adkisson had an ultrasound performed of plaintiff's husband's penis and scrotum on June 3, 2010. The scan indicated Peyronie's disease and Dr. Adkisson referred him to a urologist, Andrew Wright, M.D. Dr. Wright saw plaintiff's husband on June 15, 2010, and diagnosed him with Peyronie's disease, diabetes mellitus, and morbid obesity. Dr. Wright noted that plaintiff's husband's Peyronie's disease was "very severe." Id.

Dr. Wright referred plaintiff's husband to James Wendelken, M.D. of the Urology Center of Oklahoma. Dr. Wendelken saw plaintiff's husband on June 24, 2010. During this visit, Dr.

Wendelken noted that plaintiff's husband's pain from the Peyronie's disease had "been very severe and it ha[d] been difficult to control the pain." (R. 18-19). Dr. Wendelken's impression was "debilitating penile pain and Peyronie's disease, severe." (R. 19). Plaintiff's husband received injections and NSAIDs. The ALJ then noted that according to records from Indian Healthcare Resources Center dated from May 2009 to August 2010, plaintiff's husband was "mainly treated for his diabetes and hypertension." Id.

On October 28, 2010, plaintiff's husband received a consultative mental status examination from Robert Schlottmann, Ph.D. After interviewing plaintiff's husband and performing an evaluation, Dr. Schlottmann assessed him with "adjustment disorder with depressed mood (chronic), Peyronie's disease, diabetes, high blood pressure, high triglycerides, high cholesterol, and history of TIA, per claimant report." Id. The ALJ summarized Dr. Schlottmann's report, stating that plaintiff's husband "appeared to have a poor working memory, had a fair fund of knowledge, fair ability to form abstract verbal concepts, had difficulty doing simple arithmetic, and did not respond well to questions involving common sense and judgment (Exhibit 9F)." Id.

On December 9, 2010, plaintiff's husband returned to Dr. Wendelken. His pain had lessened, and Dr. Wendelken gave him more injections and placed him on NSAIDs again. Dr. Wendelken noted that surgery was not an option because there was too much plaque. Id. Plaintiff's husband returned to Dr. Wendelken on April 7, 2011, complaining that his pain level was elevated. Surgery was still not an option, so Dr. Wendelken ordered 400 mg of Pentoxifylline (a drug to improve blood flow) be taken two to three times a day. Id.

On January 24, 2011, Dr. Adkisson completed a medical source statement for plaintiff's husband, opining that plaintiff's husband could lift and/or carry less than ten pounds; stand and/or walk less than two hours of an eight-hour workday: and sit less than two hours in an

eight-hour workday, with alteration from sitting to standing periodically to relieve pain. Dr. Adkisson also limited push and/or pull in both his upper and lower extremities; noted that he was unable to climb, balance, kneel, crouch, or crawl, but could occasionally stoop; he was limited in reaching in all directions, but handling was unlimited as to fingering and feeling. He should avoid concentrated exposure to extreme temperatures, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and even moderate exposure to fast and dangerous machinery and unprotected heights. (R. 20).

Plaintiff's husband reported to Southcrest hospital's emergency room on January 31, 2011, and was diagnosed with acute anxiety and acute sinusitis. Id. Plaintiff's husband saw Dr. Adkisson again in April 2011 to follow up on panic attacks. Dr. Adkisson prescribed Ativan.[3]

On July 18, 2011, plaintiff's husband presented to the emergency room for suicidal ideation. His blood pressure and glucose levels were elevated, and he tested positive for cannabis and benzodiazepines. Id. In addition to suicidal ideation, plaintiff's husband made a threat to blow up Jenks High School because his son did not meet graduation requirements. He received inpatient treatment from July 19, 2011 to July 22, 2011. He was discharged against medical advice with the diagnoses of major depression, panic disorder, diabetes, hypertension, obesity, and Peyronie's disease, problems with psychological factors, financial stress, social environment, employment and health, and a GAF score of 45 on admission, improved to 65 on discharge. Id.

A few days later, plaintiff's husband admitted himself to Laureate Psychiatric Hospital, again because of suicidal ideations. He said that his mood had declined since being diagnosed with Peyronie's disease, described himself as a "chronic worrier," and said he experienced panic attacks once or twice a week for the past year. Id. He admitted auditory hallucinations, in the

---

[3] The ALJ noted that "no mention was made of [plaintiff's husband's] anxiety-causing marijuana use" during this visit about anxiety. (R. 20).

form of hearing voices that told him to hurt himself. He believed he was being watched. He admitted drinking occasionally, said he quit smoking 18 years before, and admitted that he smoked marijuana occasionally. (R. 20). He walked away from treatment the next day, but returned on July 27, 2011, admitting that he needed help. (R. 21). Laureate discharged him August 1, 2011. His mood had stabilized, he tolerated his medications, he was more hopeful, his suicidal ideations were resolved, and he had acceptable plans for follow up treatment and safety. His diagnoses on discharge were major depressive disorder, recurrent episode, severe, specified as with psychotic behavior, and a GAF score of 60 (indicative of "moderate to mild symptoms.") Id.

On August 8, 2011, plaintiff's husband returned to Dr. Adkisson. The ALJ noted Dr. Adkisson's impressions of depression status post suicide attempt, bipolar disorder, diabetes mellitus, Peyronie's disease, chronic pain, and hypertension.

Plaintiff's husband was again admitted to Laureate Psychiatric Hospital on October 3, 2011 because of a suicide attempt. He denied alcohol or tobacco use, but admitted to occasional marijuana use. Id. He reported his chronic pain from Peyronie's disease as stable. On examination, both upper and lower extremities retained good muscle strength, with equal grip in each hand. His deep tendon reflexes were positive and equal bilaterally. He admitted that he stopped taking his medications about a month prior to this attempt because he feared becoming addicted. Id. He also admitted that before he stopped his medications, his mood was "much improved" and he was doing well. Id. He was discharged October 7, 2011, with the same diagnoses as upon his prior discharge on August 1, 2011.

Dr. Adkisson completed another medical source statement on November 7, 2011. This opinion was essentially the same as the January 24, 2011 opinion, but in this opinion, Dr. Adkisson only limited plaintiff's husband's lower extremities for push and/or pull; he added a

restriction to never stoop, climb, balance, kneel, crouch, or crawl; he limited fingering and feeling; and stated that plaintiff's husband "should avoid all exposure to extreme temperatures, fumes, odors, dusts, gases and poor ventilation (Exhibit 27F)." (R. 21).

The ALJ discussed many inconsistencies between plaintiff's husband's statements and the objective evidence of record. (R. 22). The ALJ ultimately found that plaintiff's husband's "alleged effect of [his] symptoms on activities of daily living and basic task performance is not consistent with the total medical and non-medical evidence in this file," and that his "description of the symptoms and limitations, … has generally been inconsistent and unpersuasive and the claimant has not provided convincing details regarding factors that precipitate the allegedly disabling symptoms. There are times the claimant was not compliant with his medication and the results were worsening symptoms. As long as he was compliant with his medications, his conditions improved." Id.

After this discussion, the ALJ discussed the opinion evidence which supported his RFC assessment. (R. 22-23). The ALJ accorded "great weight" to the records of Dr. Wendelken regarding plaintiff's husband's Peyronie's disease because he is "an expert in his field." (R. 22). He gave "considerable weight" to the records of Dr. Wright, who referred plaintiff's husband to Dr. Wendelken. He also gave "considerable weight" to Dr. Schlottmann, the consultative mental examiner, who diagnosed plaintiff's husband with an adjustment disorder with depressed mood. Id. The ALJ also gave "considerable weight" to the mental health records of Hillcrest and Laureate, which both showed mild symptoms on discharge. (R. 22-23). Records showing non-compliance with instructions from Claremore Indian Hospital and records showing non-compliance with instructions from Indian Healthcare Resource Center were given substantial weight. These instructions included encouragement to exercise, eat healthier, and lose weight. (R. 23).

9

The ALJ also discussed the two "physical medical source statements" submitted by Dr. Adkisson. (R. 21-22). He noted that Dr. Adkisson was plaintiff's husband's treating physician, and that Dr. Adkisson treated him for hypertension, diabetes, and all other general issues. Id. The ALJ said that Dr. Adkisson opined that plaintiff's husband could "perform at the less than sedentary exertional level," but noted that "[t]his is not consistent with the records as a whole. State agency [sic] indicates that the claimant can perform at the light exertional level." Id. The ALJ determined that plaintiff's husband's obesity was the main obstacle limiting his abilities. Id.

Based on this evidence, the ALJ concluded that plaintiff's husband would have the following RFC:

> With respect to lifting, carrying, pushing, and pulling, he is limited to light and sedentary exertion work. With respect to walking or standing, he is limited to 2 hours (combined total) of an 8-hour workday, with regular work breaks. He is able to sit for 6 hours (combined total) of an 8-hour workday, with regular work breaks. He is able to climb ramps or stairs only occasionally, is able to bend, stoop, crouch, and crawl not more than occasionally and is unable to climb ropes, ladders, and scaffolds, or work in environments where he would be exposed to unprotected heights and dangerous moving machinery parts. He is unable to perform tasks requiring overhead reaching more than occasionally and is further unable to perform tasks requiring the use of foot pedals more than occasionally. He is able to understand, remember, and carry out simple instructions in a work-related setting, but is unable to interact with the general public more than occasionally, regardless of whether that interaction is in person or over a telephone.

(R. 16-17). The ALJ summarized the weight evidence by saying that records from Dr. Wendelken, Dr. Wright, Indian Healthcare Resources Center, Claremore Indian Hospital, Hillcrest Medical Center, and Laureate Psychiatric Hospital all supported this RFC finding. (R. 23).

As formulated by the ALJ, plaintiff's husband's RFC precluded his past relevant work as a fast food clerk, donut baker, or contact clerk. (R. 23). Relying on the vocational expert's testimony; however, the ALJ found that plaintiff could work as an optical assembler, laminator,

polisher, or sorter. (R. 24). According to the vocational expert's testimony, the *Dictionary of Occupational Titles* report that 4,400 such total jobs existed in Oklahoma. Id. The ALJ found that this testimony established that plaintiff's husband could perform other work. Id. Accordingly, the ALJ found that plaintiff's husband was not disabled and denied his application for benefits. (R. 25).

## ANALYSIS

On appeal, plaintiff alleges one point of error: that the ALJ failed to properly determine the weight given to the treating source opinions.[4] (Dkt. # 27 at 4).

**Treating physician opinions**

Plaintiff argues that the ALJ failed to properly apply the "directives of 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2),[5] and Social Security Ruling 96-2p" to determine the amount of weight to afford Dr. Adkisson's opinions. Plaintiff points out that the ALJ gave "no explanation" for the weight he gave Dr. Adkisson's opinions and concludes that the ALJ "did not accord *any* weight to Dr. Adkisson's opinion as a treating physician." (Dkt. # 27 at 6). The Commissioner counters that "an ALJ must elucidate his reasoning sufficiently 'to make clear to any subsequent reviewers the weight the adjudicator gave to the [source's] medical opinion and the reasons for that weight.'" Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003)); (Dkt. # 28 at 4). The Commissioner concedes that the ALJ's wording should have been more specific, but she maintains that the decision clearly shows that the ALJ afforded no weight to Dr. Adkisson's opinions. The Court agrees with both counsel that the ALJ clearly afforded no weight to Dr. Adkisson's opinions.

---

[4] The Court notes and appreciates the fact that plaintiff's briefs are succinct and well written, and her arguments, even though not accepted, are well developed and clear.

[5] The citations regarding treating physician analysis are currently found at 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

The issue, therefore, is whether the ALJ's reasoning in affording no weight to Dr. Adkisson's opinions is sufficiently elucidated and whether that reasoning is consistent with the regulations.

The proper procedure for evaluating the opinion of a treating physician is well established. "Under the regulations, the agency rulings, and our case law, an ALJ must give good reason in the notice of determination or decision for the weight assigned to a treating physician's opinion." <u>Watkins</u>, 350 F.3d at 1300 (citing 20 C.F.R. § 404.1527 (d)(2) and Social Security Ruling 96-2p, 1996 WL 374188 at 5). "The type of opinion typically accorded controlling weight concerns the 'nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions.'" <u>Lopez v. Barnhart</u>, 183 Fed. Appx. 825, 827 (10th Cir. 2006) (unpublished). Generally, an ALJ should give more weight to opinions from treating physicians. <u>Watkins</u>, 350 F.3d at 1300 (citing 20 C.F.R. § 404.1527(d)(2)). However, it is error to give the opinion controlling weight simply because it is provided by a treating source. <u>Id.</u>

In determining whether the opinion should be given controlling weight, the analysis is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight" by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. <u>Id.</u> If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, she must then confirm that the opinion is consistent with other substantial evidence in the record. <u>Id.</u> "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." <u>Id.</u>

Second, if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the

other substantial evidence in the record, it is entitled to deference and must be evaluated in

reference to the factors enumerated in 404.1527 and 416.927. Those factors are:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must

give good reasons in her decision for the weight she ultimately assigns the opinion. Id. (citing 20

C.F.R. § 404.1527(d)(2)).

Third, if the ALJ rejects the opinion completely, she must then give specific, legitimate

reasons for doing so. Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1990)). The reasons

must be of sufficient specificity to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating physician's opinion and the reasons for that weight. See Oldham,

509 F.3d at 1258 (10th Cir. 2007) (holding that an ALJ, in weighing a treating physician's

opinion, need not analyze every factor, but must render a decision that is "sufficiently specific to

make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight.")

In the instant case, the ALJ specifically noted that Dr. Adkisson was plaintiff's husband's

treating physician and that he been plaintiff's husband's treating physician since at least 2010

(factor one), noted the conditions Dr. Adkisson treated (factor two), and stated that the doctor's

extreme restrictions were not supported by the record (factor three). (R. 22). Thus, the ALJ

considered Dr. Adkisson's opinions and addressed three of the factors. In addition, the ALJ

concluded that Dr. Adkisson's opinions regarding plaintiff's husband's functional capacity were

". . . not consistent with the record as a whole" or the state agency doctors. Supra at 10. Whether

or not the Court agrees with this conclusion, it is supported by substantial evidence in the record,[6] so it should not be disturbed on appeal. In addition, the ALJ's conclusion and discussion are sufficient to support his decision not to afford Dr. Adkisson's opinions controlling weight.

As to the amount of weight the ALJ accorded Dr. Adkisson's opinions, the fact that the ALJ found Dr. Adkisson's opinions "not consistent with the record as a whole" addresses the fourth factor which the ALJ could consider in determining whether to accord *any* weight to those opinions. The ALJ also specifically noted that one of plaintiff's husband's doctors was an expert (which the Court views as being interchangeable with "specialist") in his or her field. See, e.g. R. at 22 (according great weight to Dr. Wendelken's opinion and noting that he is an "expert in his field"). The ALJ did not refer to Dr. Adkisson as an expert, and the record would not have supported such a designation, which is factor five. As mentioned above, the ALJ also addressed factors one, two, and three.

Thus, the ALJ considered five of the factors used to determine the weight to be given Dr. Adkisson's opinions and, as both parties agree, he accorded no weight to those opinions. There can be little doubt that the ALJ's reasoning in this respect is not a picture of clarity, but it is "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to [Dr. Adkisson's opinions]." Oldham, 509 F.3d at 1258.

---

[6] For instance, the ALJ discussed inconsistencies between plaintiff's husband's subjective statements and the record evidence from Dr. Wendelken showing that plaintiff's husband's pain improved. (R. 19, 22). Additionally, plaintiff's husband's reported level of daily activities does not support his claims of "totally disabling pain." (R. 22). In fact, plaintiff's husband's own function reports contradict Dr. Adkisson's severe restrictions. Id. The ALJ also noted plaintiff's husband's relatively high GAF scores of 60 and 65 after discharge from Hillcrest and Laureate, and he noted records from Indian Healthcare Resource Center showing non-compliance with treatment and recommendations to lose weight. (R. 22-23). The ALJ pointed out that Dr. Adkisson's opinions indicated that plaintiff's husband could only perform below the sedentary level of exertion but that State Agency physicians concluded that plaintiff's husband could perform at the light exertional level of functioning. Id. Again, whether or not the Court agrees with the ALJ, this evidence is substantial enough to support the conclusion.

In addition, plaintiff failed to offer any reasoning showing that her husband was prejudiced by the ALJ's technical failure to mention that he did not give Dr. Adkisson's opinions any weight. In any event, the parties agree that the ALJ did not assign any weight to those opinions.

Put simply, the Court finds that the ALJ's lengthy discussion of the medical evidence is sufficient to allow the reviewer to reasonably discern the ALJ's reasoning and the weight he gave to Dr. Adkisson's opinions.

## CONCLUSION

For the foregoing reasons, the ALJ's decision denying plaintiff's husband's claims for benefits is affirmed.

SO ORDERED this 25th day of February, 2014.

T. Lane Wilson
United States Magistrate Judge